UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:21-cr-733 (CRC)** |
| v. | : | |
| | : | |
| JEREMY K. BAOUCHE, | : | |
| | : | |
| Defendant | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jeremy K. Baouche to 30 days' incarceration, 60 hours of community service, 36 months of probation, and $500 in restitution.

I.      **Introduction**

Defendant Jeremy K. Baouche, 25 years old, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on August 31, 2022, (ECF No. 24 at ¶ ¶ 8-11) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Baouche pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a sentence of 30 days' incarceration is appropriate in this case because he (1) entered the Capitol through the Upper West Terrace Doors while alarms were blaring, (2) remained in the building for over 17 minutes, (3) used his megaphone to rile up the crowd by yelling "whose house" while the crowd responded "our house," (4) further incited the crowd by chanting "Fuck McConnell" while they responded in kind, (5) all in the presence of a massive crowd whose foray into the Senate Wing was being restrained by law enforcement in anti-riot gear, and (6) has expressed no remorse for his actions.

The Court must also consider that Baouche's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the defendant's participation in a riot that succeeded in halting the Congressional certification combined with the defendant's preparation for violence, his celebration and endorsement of the violence on that day, his lack of remorse, and the potential for future violence renders a significant jail sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021, Attack on the Capitol

To avoid unnecessary exposition, the government refers the Court to the general summary of the attack on the U.S. Capitol. *See* ECF 24 (Statement of Offense), at 1-7.

### Defendant Baouche's Role in the January 6, 2021, Attack on the Capitol

On January 5, 2021, Baouche traveled from his home in New London, Connecticut to Washington, D.C. to protest Congress' certification of the Electoral College. An internet search

history of Baouche's work computer, from December 1, 2020, until January 20, 2021, showed searches on topics including the inauguration, the U.S. Capitol Building layout, guns, rifle scopes, lasers, Trump protests, and "FBI Capitol". Baouche purchased a Pro-megaphone rechargeable battery and Pyle megaphone 50-watt siren bullhorn speaker with detachable microphone and lightweight strap sometime between November 22, 2020, and December 26, 2020.

On January 6, 2021, Baouche entered the U.S. Capitol through the Upper West Terrace at approximately 2:35 p.m. (*See* Figure 1 below).



Figure 1

The door through which he entered was not a door used for tourists and there were alarms blaring as entry was made. After he came in, he went upstairs to the Rotunda area. The staircase to the Rotunda is just beyond the vestibule area Baouche entered.

Baouche was in the Rotunda for several minutes. At 2:37, he briefly left and then returned at 2:38. He continued to walk around the Rotunda. (*See* Figure 2)



Figure 2

At approximately 2:40 p.m., he left the Rotunda, again through the north door, and continued walking north until he was stopped near the Old Senate Chamber because Capitol Police were preventing the rioters from proceeding further. (*See* Figure 3).



Figure 3

Baouche, using his bullhorn, began chanting "Who's House?" while the crowd responded, "Our house." That chant went on for approximately 20 seconds.[2] (*See* Figure 4; :55 on the video). About a minute later, he began chanting, through his bullhorn, "you serve us, not them" as he was facing the officers. (1:28 on the video). The audio can be heard but the video was not caught on camera.

---

[2] The government anticipates offering a 3 ½ minute video at sentencing showing Baouche's conduct. The video will be provided to chambers and defense in advance of the sentencing hearing.



Figure 4

Then Baouche, while in the same area, began chanting "Fuck McConnell" while the crowd responded in kind. (2:38 on the video). Still using the bullhorn, he chanted "it's about time Mr. McConnell realizes he works for us. The police work for us." (*See* Figure 5; 2:51 on the video).



Figure 5

At approximately 2:50 p.m., Baouche reentered the Rotunda and walked out of the east side. He exited the Capitol at approximately 2:52 p.m. (*See* Figures 6 and 7).



Figure 6



Figure 7

*Defendant's Interview*

Baouche gave an interview to the FBI on June 10, 2022. He said he traveled to the D.C. area on January 5, 2021, to attend a rally planned for January 6, 2021. His motivation for attending was because he believed the election results were fraudulent. On the afternoon of January 6, he was at a restaurant near Pennsylvania Avenue when he began to see media coverage showing police utilizing tear gas on a crowd of people on the Capitol grounds. He then left the restaurant and went to the Capitol. When he got there, someone helped him over a wall, and then handed him a pair of black safety glasses and told him to keep them because he would need them. Baouche believed he entered the Capitol through the west terrace (he did) with a large crowd of people. He did admit knowing it was unlawful for him to be in the Capitol "but believed the adrenaline rush of being in the building had hampered his decision-making abilities."

8

*The Charges and Plea Agreement*

On November 2, 2021, the United States charged Baouche by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On November 10, 2021, law enforcement officers arrested him at his residence in New London, Connecticut. On December 14, 2021, the United States charged Baouche by a four-count Information with violating 18 U.S.C. § 1752(a)(1), entering and remaining in a restricted building or grounds; 18 U.S.C. § 1752(a)(2), disorderly and disruptive conduct in a restricted building or grounds; 40 U.S.C. § 5104(e)(2)(D), disorderly conduct in a Capitol Building; and 40 U.S.C. § 5104(e)(2)(G), parading, demonstrating, or picketing in a Capitol Building. On August 25, 2022, pursuant to a plea agreement, Baouche pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Baouche now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment, a term of probation of up to five years, and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days' imprisonment, 60 hours of community service, 36 months' probation, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Baouche's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Baouche, the absence of violent or destructive acts is not a mitigating factor. Had Baouche engaged in such conduct, he would have faced additional criminal charges.

He researched information about the Capitol Building layout a month prior to coming to Washington. In that same time period, he purchased a bullhorn. Baouche entered the building through a door in which alarms could be heard blaring. He spent most of his time in the Rotunda, where it was clear control ropes had been strewn about. He walked right by them as he continued his self-tour through the Capitol. One of the most important factors in Baouche's case is the disruption he caused by continuing to rile up a mob that had already illegally entered the building.

It is clear his progress into the Senate Chamber was only stymied by the presence of numerous law enforcement officers that were being confronted by angry rioters.

Baouche spent approximately 17 minutes in the Capitol before he left. Baouche has not expressed any remorse of his actions from January 6.

The nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Baouche

As set forth in the PSR, Jeremy Baouche does not have a criminal history. The PSR did not identify any mental, emotional, physical, or other conditions that would mitigate Baouche's actions on January 6. The absence of those factors demonstrates a conscious, reasoned, intelligent man who willingly and knowingly paraded and demonstrated in the Capitol Building. This factor favors a period of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

11

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for specific deterrence in this case is apparent in light of Baouche's pre-January 6, 2021, planning and conduct on January 6. He sought information on the layout of the Capitol. He bought a bullhorn, a device designed to ensure he would be heard. He used the device to encourage disruptive behavior by others, while he was illegally in the Capitol. He entered the Capitol after being helped over a wall and alarms were blaring This conduct merits a sentence of incarceration.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Baouche based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Baouche has pleaded guilty to Count Four of the Superseding Information charging him with violating 40 U.S.C. § 5104(e)(2)(G), parading, demonstrating, or picketing in a Capitol Building. This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar

---

[3] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Anthony Scirica*, 21-cr-457 (CRC), the defendant led rioters through Statuary Hall towards the House Chamber because he thought that's where the electors were. He chanted "USA" at police and observed violence against officers. He had not expressed any remorse for his involvement. His lack of remorse was exacerbated by saying to the FBI that January 6 would "make a good story…when I am a grandfather." The defendant remained inside for 31 minutes and heard alarms going off. The Court imposed a sentence of 15 days' incarceration. Baouche's conduct was more egregious than Scirica's. Baouche engaged in preplanning for entry into the U.S. Capitol. And compared to Scirica's single chant, Baouche used his bullhorn to incite and rile up the crowd of rioters directly confronting police.

In *United States v. Daniel Morrissey*, 21-cr-660 (RBW), the defendant (1) spent a total of 28 minutes inside the Capitol; (2) paraded around the building, loudly chanting; (3) took selfies while inside the Capitol building; and (4) sent videos of himself inside the Capitol to a coworker, in an apparent attempt to boast of his activities. For this conduct, which was less severe than Baouche's, Judge Walton sentenced Morrissey to 45 days' imprisonment and 36 months of probation.

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days' incarceration, 60 hours of community service, 36 months of probation[4], and $500 in restitution. Such a sentence

---

[4]     Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. *See, e.g.,* 18 U.S.C. § 3561(a)(3); *see, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible

protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

---

under law and warranted by the circumstances of this case); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law.

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(1), which authorize limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992). In this district, at least two judges have similarly imposed multiple terms of imprisonment consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ *Susan T. Lehr*
         SUSAN T. LEHR
         Assistant United States Attorney
         NE Bar No. 19248
         District of Columbia Capitol Riot Detailee
         1620 Dodge St, #1400
         Omaha, NE  68102
         Telephone: 402-661-3715
         Email: susan.lehr@usdoj.gov

19

## <u>CERTIFICATE OF SERVICE</u>

On this 7th day of February, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ *Susan T. Lehr*

SUSAN T. LEHR
Assistant United States Attorney
NE Bar No. 19248
District of Columbia Capitol Riot Detailee
1620 Dodge St, #1400
Omaha, NE  68102
Telephone: 402-661-3715
Email: susan.lehr@usdoj.gov

20